IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LESLIE CONTROLS, INC.,<br><br>Debtor. | HON. JEROME B. SIMANDLE<br><br>Misc. No. 11-0013 (JBS)<br>[Bankr. Case No. 10-12199 (CSS)]<br><br>**ADDITIONAL FINDINGS IN SUPPORT**<br>**OF AFFIRMATION ORDER** |

SIMANDLE, District Judge:

## Procedural and Factual Background

This matter is before the Court on the motion of Leslie Controls, Inc. to affirm the bankruptcy court's confirmation of its Chapter 11 Plan, as required by 11 U.S.C. § 524(g)(3)(A) for an injunction related to the Plan to go into effect.[1] Section 524(g) of the Bankruptcy Code provides for a mechanism by which debtors set up and fund a trust that assumes the asbestos-related liability of the debtor. 103 Pub. L. No. 394 (1994) codified as 11 U.S.C. § 524(g). No party objects to this motion.

Leslie Controls, Inc., is the debtor and debtor-in-possession in Case No. 10-12199 (CSS) pending in the United

---

[1] The statute provides that "If . . . the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan . . . the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6)." 11 U.S.C. § 524(g)(3)(A). Since the Plan was not confirmed by this Court, it must be affirmed by this Court in order for the injunction to become valid and enforceable.

States Bankruptcy Court for the District of Delaware. The factual and legal background are well documented in the Bankruptcy Court's Findings of Fact, Conclusions of Law, and Order Confirming the Second Conformed First Amended Plan of Reorganization of Leslie Controls, Inc., under Chapter 11 of the Bankruptcy Code [Docket Item 503] on January 18, 2011.

An important aspect of the approved Plan, which is before this Court on motion for affirmance, is the Asbestos PI Channeling Injunction and the Asbestos PI Trust (hereafter the Trust), which, in very general terms, would be established to pay asbestos-related personal injury claims of approximately 1,300 current claimants and an unknown number of future asbestos claimants who assert claims against Leslie Controls and its parent CIRCOR. The Channeling Injunction would protect Leslie Controls and its parent CIRCOR and certain related companies[2] from asbestos-related liabilities for personal injury arising from Leslie Controls' products and operations, and pay such claims according to a claim valuation matrix established in the Plan. The Asbestos PI Trust will assume all liability and

---

[2] These other companies include Watts, which purchased the stock of Leslie in 1989, and which spun off Leslie and other Watts subsidiaries in 1999 to the newly-created company, CIRCOR. As part of that spin-off, CIRCOR and Watts entered into a Distribution Agreement that provided that CIRCOR will indemnify Watts for liability arising out of the CIRCOR liabilities.

2

responsibility for all Asbestos PI claims.  See Plan, Section 9.3.

   A.  **Funding for the Trust**

Funding for the Asbestos PI Trust comes from a $1 million promissory note from Leslie, on which Leslie is required to make quarterly payments to the Trust, and from a payment by CIRCOR of $74 million.  Because this payment by CIRCOR also essentially acquires the present value of Leslie, the net value to the Asbestos PI Trust consists of the $74 million reduced by the Leslie asset value which is estimated to lie between $27.8-32.4 million, as estimated by the Houlihan-Lokey firm, yielding a net contribution of about $42-46 million by CIRCOR to obtain protection from present and future asbestos-related claims arising from Leslie's operations.  The creditors' expert, Charter Oak, values Leslie somewhat higher, at $48 to 53 million, but it appears doubtful that Leslie is currently worth that much to a third party.  The Future Claims Representative values CIRCOR's net contribution to the Trust at $35 million.  (Tr. 2/4/11 at 63.)  Leslie's remaining liability insurance policies arguably are worth $48 million in solvent primary and excess insurance that potentially remains available to pay Leslie asbestos claims, although this amount is greatly disputed by the insurance

carriers who are not part of this settlement.[3] As part of the Plan, Leslie will confer upon the Trust its rights to pursue liability insurance claims against the various carriers. Leslie is also holding settlement proceeds of $2,625,000 with respect to insurance carrier CNA, which will also be paid into the Trust. Thus, the total cash funding the Trust will be $76,625,000, plus rights to seek liability insurance coverage with face value of $48,000,000, plus Leslie's $1,000,000 note.

## B. **Estimating Valuation of Present and Future Claims**

The value of Leslie's total liability for current and future asbestos claims is unknowable, but has been estimated at $88.1 million in present value, according to the estimate prepared by the claim valuation experts HR&A. (Ex. HN.) The methodology for estimating such claims was also described in the First Amended Disclosure Statement [Docket Item 173]. The Future Claims Representative, James L. Patton, Jr., closely examined these figures and retained an experienced claims evaluation consultant, Analysis, Research and Planning Corp ("ARPC"), to assess the future claims estimates. (Tr. 2/4/11 at 48.) If the HR&A estimate holds as time passes, the Trust may be able to pay 100%

---

[3] All carriers have withdrawn any objection to this settlement upon the Bankruptcy Court's approval, on January 18, 2011, of amended language in the Second Conformed First Amended Plan that was acceptable to the insurers. Thereafter, the present motion to affirm the confirmation was restored to this Court's docket for adjudication.

4

of the grid matrix amounts for future claimants, while if claims exceed the projections, the claims will be paid in reduced percentages to preserve equitable benefits for future claimants. Even if future claims exceed the estimate, the amounts to be paid by the Trust to current and future claimants will be equivalent. Under the Trust, the Plan provides for equitable treatment of holders of present and future claims by eliminating litigation costs and protecting Trust assets for distribution over time. The initial payment of claims will be at 40% of the full value, as determined from the approved grid matrix. This pro rata figure will be examined by the Trustee in light of claims history at least once every three years, and it will be adjusted as appropriate to preserve the Trust equitably for future claimants.

### C. Selection and Duties of Future Claimants' Representative

The 1,300 current asbestos claimants were represented at all times in pre-petition negotiations by their attorneys, and the unknown future asbestos claimants were represented in pre-petition negotiations by a Future Claimants' Representative ("FCR") initially selected by the Debtor afer consultation with other participants in the process. The selected FCR is James L. Patton, Jr., an attorney in private practice with impressive experience serving as an FCR in similar cases, or representing the FCR in such asbestos-related cases. This Court requested

5

further argument addressing the selection and service of the FCR to probe the independence of the FCR from the Debtor which retained him, and to determine whether appointment of Mr. Patton as future claims representative, which was ratified by the Bankruptcy Court, was in the best interests of the future claimants.

The importance of having a future claimants representative involved in a pre-negotiated case is underscored by the Court of Appeals in In re Combustion Engineering, Inc., 391 F.3d 190, 245 (3d Cir. 2004). The Third Circuit observed that it was imperative for the future claimants to be "adequately represented throughout the reorganization process." Id.

This Court is fully satisfied that the selecting of Mr. Patton was in the best interests of the future claimants, notwithstanding the fact that he was retained for these purposes by the Debtor, who paid his fees for his services as negotiations continued. In a pre-negotiated asbestos-related bankruptcy case, as a practical matter, the debtor considering a Chapter 11 filing is the only entity in a position to retain and pay an individual to represent the interests of future claimants. Future claimants would otherwise be unrepresented in the process, and counsel for current claimants would have a conflict if asked to simultaneously represent future claimants in negotiations over limited funding resources.

The incentives for selecting a responsible and independent future claimants representative were in play in this case. The FCR needed to be knowledgeable about asbestos litigation and trusts, and to command respect from others in the negotiation process. The FCR must have the credibility and preparation to press for the best deal possible for the future claimants under the particular circumstances, or else the negotiated plan would not be approvable by the Bankruptcy Court. The FCR's pre-petition conduct would have to pass muster with the Bankruptcy Judge or the proposed FCR would not be appointed by the Bankruptcy Court. The fact that, of necessity, the pre-petition FCR was selected and paid by the debtor, who could terminate the FCR at will, are factors that must be weighed against the FCR's actual performance in assessing the FCR's independence of the debtor. In this case, the FCR's engagement letter clearly determined that his loyalty was owed exclusively to the future claimants, and it evidenced no intent to create an employer-employee relationship.

**D. Other Supplemental Findings**

In an Order of February 7, 2011, this Court adopted and affirmed the Bankruptcy Court's Findings of Fact and Conclusions of Law confirming the Second Conformed First Amended Plan of Reorganization [the "Plan"]. In the February 7 Order, this Court informed the parties of its intention to file additional findings

7

of fact in support of the affirmation. The Court did so because the bankruptcy court's findings of fact and conclusions of law provided a necessary basis for this decision, but that further explanation was required as to several aspects of this Court's affirmation touching upon the fairness of this Plan for the interests of future asbestos-related injury claimants. In particular, the findings with respect to 11 U.S.C. § 524(g)(4)(B)(ii) regarding the fairness and equity of the Plan only offered a conclusory restatement of the statutory language, requiring some supplementation herein.

Therefore, after convening a hearing on February 4, and reviewing supplemental submissions by Debtor's counsel and by counsel for the Future Claimants' Representative, the Court has made the additional findings of fact and conclusions of law enumerated herein in order to complete the record. Except where noted, these findings should be regarded as additional findings with respect to Section U paragraph 14 of the Bankruptcy Court's Findings of Fact and Conclusions of Law [Docket Item 1], addressing the question of whether the Plan is "fair and equitable with respect to the persons that might subsequently assert such demands in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii).

1. In their pre-petition negotiations, the parties examined the fairness of the Plan as compared to the likely alternatives in some detail, and in good faith. (Oct. 27, 2010 Confirmation H'rg Tr. 25:25-31:18.) The parties explored, exchanged evidence, and debated the present value of Leslie and the likely volume and cost of current and future claims, (id.), and they came to reasonable conclusions about how best to estimate those variables. The valuation of Leslie did not vary enough between the various parties to matter to the overall fairness of the Plan, (Exs. to Plan Confirmation TT & AAA), and the estimation of future claims was based on what counsel explained to be the industry's standard formula, the so-called Nicholson-KPMG method. (Ex. HH.)

2. Additionally, all sides in the pre-petition negotiation examined the likelihood of asbestos liability on the part of Leslie's parent company, CIRCOR — going so far as to draft a sample summary judgment motion with respect to derivative liability. (Ex. VV, WW, XX, & YY.) This issue is critical since the channeling injunction in this case would prevent suits brought against CIRCOR as well as Leslie. In light of the available evidence and range of likely outcomes, it was reasonable to conclude that this Plan provides current and future claimants with awards that exceed the benefits likely to be available under the alternative scenarios, including Chapter 7

bankruptcy of Leslie Controls or a Chapter 11 bankruptcy of Leslie Controls without the participation of CIRCOR. Under the circumstances of this case, in which Leslie Controls asbestos-related activity ceased years before Watts (in 1989) and CIRCOR (in 1999) acquired Leslie Controls, in which Leslie's separate corporate existence was maintained and Leslie has conducted business in its own name, and in which CIRCOR and Watts do not appear to have diverted or commingled Leslie's assets or otherwise defrauded Leslie's creditors, the prospect of ever proving derivative liability of CIRCOR or Watts for Leslie's asbestos activity appears to be very slim. This conclusion was reasonably reached by representatives of the current and future claimants after having an "open door" to pre-petition discovery of all pertinent corporate records, together with CIRCOR's draft summary judgment brief and supporting declarations. The proposal before this Court reasonably accounts for the prospect that litigation against CIRCOR or Watts seeking to find them liable for Leslie's asbestos conduct would be unsuccessful, leading to the conclusion that CIRCOR's contribution to this settlement is fair in exchange for the protection given by the channeling injunction.

3. In drafting the provisions of § 524(g), Congress was particularly "concerned that full consideration be accorded to the interests of future claimants, who, by definition, do not

have their own voice," H.R. Rep. No. 103-835 at 41 (1994). The Court finds that the future claimants were zealously represented by Mr. Patton as the FCR, as discussed above. Because the future claimants are the only parties who are not present and representing their own interests in this matter, the Court has followed the will of Congress in paying careful attention to how the Plan affects this key group.

    4. If, as provided in the proposed Trust, current and future claims are paid in substantially the same manner and the trust is operative until claims are all paid, then the interests of future claimants are equitably aligned with the current claimants. Consequently, the Court has paid special attention to the ways in which the future claimants could be disadvantaged relative to current claimants by the Trust distribution procedures, and to the effect of the distribution procedures on the expected longevity of the Trust. It bears repeating that the proposed Trust is designed to treat the claims of current and future claimants equally, and that the current claimants, through their attorneys, have overwhelmingly voted in favor of the proposed Plan. This is another assurance that the negotiations in this case resulted in a fair and adequate result for the future claimants under the circumstances.

    5. The Plan sufficiently secures the interests of the future claimants as against the current claimants. The Trust's

governing documents prevent the Trust's funds from being exhausted by early claimants by a distribution procedure in which only a fraction —- presently to be set at 40% -- of the value of claims is paid in the initial years of the Plan. (Second Amended Plan, Ex. C at 6.) That fraction will be adjusted up or down by the trustees based on the performance of the Trust and the volume of claims over time. (Id. at 7.) Additionally, the Trust provides that only a certain proportion of its principal res may be spent on claims in any given year, ensuring that the Trust remains solvent over the necessary period. (Id.)

6. A note issued by Leslie provides $1 million of the Trust's funding, a small fraction of the overall funding. On the facts of this case involving a very large up-front cash payment by CIRCOR that is itself sufficient to pay most of the estimated future liabilities of the debtor, this relatively small note is sufficient to satisfy the requirements of § 524(g)(2)(B)(i)(II),[4] and does not call into question the fairness of the Trust to future claimants given the lack of substantial future commitments to the Trust. There may be cases in which it is necessary to provide a greater overall proportion of funding by securities in order to satisfy Congress's intention that the security portion

---

[4] The Trust must "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." § 524(g)(2)(B)(i)(II). This request has been met.

12

of the funding provide an evergreen source of the Trust's revenue. See In re Combustion Eng'g, 391 F.3d 190, 248 (3d Cir. 2004) (explaining the role of § 524(g)(2)(B)(i)(II)). But here, the initial contribution to the Trust is of such magnitude, and the Trust distribution procedures have sufficient safeguards, that guaranteeing the future success of the Trust by tying it to the success of reorganized Leslie is unnecessary because the current proposal will better secure the future claimants' interests.

7. In addition to its independent review of the substantive effects of the Plan upon future claimants to ensure the Plan's compliance with § 524(g)(4)(B)(ii), the Court has also examined the procedure by which this Plan was negotiated. In particular, the Court scrutinized whether the future claimants were afforded adequate representation in the bankruptcy process by the Future Claims Representative ("FCR"), James Patton.

8. As discussed above, Mr. Patton was selected by the debtor pre-petition, paid by the debtor, and he was dischargeable by the debtor at-will. Contrary to debtor's assertion, the Court is not persuaded that it is impossible to have a pre-petition future claims representative with more independence. A potential FCR could be appointed such that he or she could only be removed for cause (such as the cessation of pre-petition negotiations), and the FCR could be nominated by a process involving other

13

constituents, or otherwise not at the sole discretion of the debtor. Leslie maintains that it needed to retain discretionary firing power for fear that if pre-petition negotiations were terminated, the FCR would continue to be paid. But it is unclear to the Court what work such a bad faith FCR — the opposite of the person they believed they had hired — would find to maliciously bill for once the negotiations had been terminated by the debtor.

    9. Nevertheless, in this case, the parties have shown that Mr. Patton was selected in good faith, and that he performed independently despite any structural conflict of interest presented by the funding mechanism for his pre-petition retention. The highly credible testimony of William Hanlon at the February 4, 2011 hearing explained that Patton was selected after extensive due diligence. Mr. Hanlon, who is counsel for CIRCOR, also explained, as agreed by the counsel for current claimants, that Patton's selection was endorsed by that constituency.

    10. Mr. Patton, who also spoke at the Court's hearing on February 4, 2011, was clearly a qualified choice for the position, who exercised his responsibilities in good faith. He spoke with knowledge and evident wisdom with respect to the challenges of representing the future claimants, revealing a reassuring level of sophistication in his analysis of the issues. Both Mr. Patton and his counsel made clear the unique value of

experience with these types of trusts; the successful establishment and operation of such trusts turns on difficult predictions that are easier to make in the light of the experience of similar trusts. Mr. Patton and his counsel persuasively explained how the Trust's distribution procedures, particularly the initial payments at 40% of their full value and the use of the predictive model for the number and value of future claims, would protect future claimants from undue depletion of the Trust's assets.

11.  In summary, the parties have adduced clear and convincing evidence that the substance of the Plan is in the interest of future claimants.  In addition to the Court's own judgments about the fairness and results of the process, the evidence shows that the interests of the future claimants were properly represented throughout both the pre-petition negotiations and the bankruptcy proceedings.  Where the future claimants' interests diverged from those of the current claimants, Mr. Patton ably negotiated on their behalf, as indicated, for example, by the conservative trust distribution procedures.

## **Conclusion**

For the above reasons, the Court has found that the Plan is fair and equitable with respect to the persons that might subsequently assert asbestos claims, in light of the benefits

provided to the Trust on behalf of Leslie and CIRCOR, satisfying § 524(g)(4)(B)(ii).  It is upon these additional findings that the Court affirms the Plan's confirmation by the Bankruptcy Court.


**March 25, 2011**                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                            United States District Judge